**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-384 (CJN)** |
| **v.** | : | |
| | : | |
| **JONATHAN ACE SANDERS, SR.,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jonathan Sanders to two (2) months home detention, as part of a 3-year term of probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

The defendant, Jonathan Ace Sanders Sr., a United States Air Force veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage. The defendant's conduct on January 6, like the conduct of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Jonathan Sanders pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in a Capitol Building. A term of home detention as part of a sentence of probation is appropriate in this case because (1) the defendant, an Air Force veteran, understood the severity of the violence surrounding the Capitol at the time he entered the building; (2) he entered the building after seeing tear gas being dispersed into the crowd from the building and a rioter trying to break a window before he entered; (3) he nonetheless went inside the U.S. Capitol despite what he observed being done in and around the Capitol and; (4) he showed no remorse when interviewed later by the FBI, also bragging about the events to another person.

### Factual and Procedural Background

#### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF Doc. 1-1 (Statement of Facts), at 1-2. As this Court knows, a riot cannot occur without rioters, and each rioter's actions contribute to the whole of the mob. The actions of the rioters at the Capitol on January 6th did not occur in a vacuum.  Each person contributed, directly and indirectly, to the violence swelling up that day, as recognized recently by Judge Chutkan. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers."). Defendant's conduct and behavior on January 6 although not personally violent, contributed to the violence and destruction of the day nonetheless.

#### *Jonathan Ace Sanders, Sr.'s Role in the January 6, 2021 Attack on the Capitol*

On January 5, Sanders and two of his friends (Witness 1 and Witness 2) drove from Indiana to Washington, D.C. to attend the Stop the Steal rally.  According to Sanders, he wanted to express his grievances about the 2020 Presidential election, and wanted an audit done on the election to

determine if there was any voter fraud.  According to the Defendant, at the end of the speech, Sanders stated President Trump said to "go to the Capital to peacefully protest" so he and his two friends followed a crowd towards the Capitol Building. When Sanders arrived at the Capitol, he heard people chanting "Four more years!" and "Stop the Steal!" He also saw a rioter punch at a window twice, trying to break it.

Sanders also saw a line of individuals with Oath Keeper patches make their way up the stairs of the Capitol. After this occurred, the Rotunda doors were breached from the inside by rioters opening the Rotunda doors.



A lone officer inside tried to keep the doors closed when rioters tried to open them.



Meanwhile officers were trying to prevent a breach outside, and one was ultimately pulled inside by rioters.





Rioters then poured into the Capitol through the Rotunda doors at approximately 2:14 p.m., while officers outside, and the officer inside continued to try to keep them out.





Witness 2, who was with Sanders, also saw a rioter trying to break out a window and saw individuals wearing Oath Keeper patches snaking up the stairs. In addition, when he and Sanders were about 50 to 60 feet from the Capitol building, he heard a loud boom and saw a confrontation between police and people in black clothing and helmets. He and Sanders then walked to the other side of the Capitol where Witness 2 saw someone in the crowd pull an officer's shield from the officer.

Sanders entered the Capitol building after the Central East doors were breached soon after he saw the individuals wearing Oath Keepers patches proceeding up the East stairs. United States Capitol Police surveillance footage showed Sanders inside the Capitol Building in the Rotunda area on January 6, 2021, entering about 2:50 p.m. through the Statuary Hall connector.



Sanders walked half the circumference of the Rotunda, using a walking stick and wearing a military vest.  He took a video while inside, a screen shot of which is below:



The Defendant left the Rotunda and traveled to the Senate side of the Capitol, then returned to the Rotunda from the same doorway three (3) minutes later. He walked the other half of the Rotunda then left after being in the Rotunda approximately three (3) minutes in total. He exited the building from the Rotunda Door (on the East side) about 2:59 pm.





*Jonathan Ace Sanders, Sr.'s Statement to the FBI*

On January 14, 2021, agents with the Federal Bureau of Investigation (FBI) interviewed

Jonathan Ace Sanders Sr. after receiving a tip two days earlier from an anonymous source

indicating a "Jon Sanders" bragged to the tipster that Sanders was at the Capitol on January 6 and

was only 70 feet away from the lady who was shot inside. During the interview, Sanders relayed

his observations, as noted above. He also told the agents he saw tear gas cannisters being thrown from inside the building into the crowd outside the doors. He also said he observed the Capitol Police letting people into the building.  Importantly, he initially told agents he did not go into the Capitol but changed that statement and admitted later in the interview he did go inside. He also admitted taking some pictures and videos while inside the building and outside at the rally.

At the end of the interview, the defendant told the agents that he believed he did nothing wrong and that "he did nothing illegal." He attended the Stop the Steal rally to protest the election results while Congress debated the certification of the electoral college so his objection could be heard. He told the agents he went to the Capitol at the direction of President Trump.

Sanders, however, told different stories to Witness 1 and Witness 2, who went with him to Washington D.C.   Witness 1 was interviewed by the FBI on January 29, 2021.  He told agents Sanders relayed to him that Sanders saw a guard open a door and throw a canister into the crowd, and that one of the rioters was able to prop open the door with a flagpole.  Sanders also told Witness 1 that the crowd got a shield from an officer and passed it into the crowd.  Lastly, Sanders told Witness 1 that Sanders went into the building after "scuffles" with the guards allowed the crowd to pass into the building.

Witness 2 was interviewed by the FBI on February 4, 2021.  He told the agents that Sanders and he were 50 to 60 feet from the Capitol building when Witness 2 heard a boom and saw a confrontation between police and people in black clothing and helmets.  He and Sanders walked to the other side of the Capitol where Witness 2 saw someone in the crowd pull an officer's shield from the officer. He also saw someone trying to break a window, and he saw a group with Oath Keepers patches make it to the doors. He and Sanders became separated, and later Sanders told Witness 2 that he had gone inside the building.

*The Charges and Plea Agreement*

On May 14, 2021, Jonathan Sanders, Sr. was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On that same day, a search warrant for the defendant's telephone and clothing that he was wearing on January 6, 2021 was executed at his home in Indiana. The clothing and the telephone were both found and seized, and the telephone analyzed.  In addition to the video inside the Rotunda mentioned above Sander's telephone contained photographs from outside the Capitol building.





On June 2, 2021, Jonathan Sanders, Sr. was charged by a four-count Information with the same offenses. On August 26, 2021, he pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building. By plea agreement, Jonathan Sanders, Sr. agreed to pay $500 in restitution toward payment for damage done to the Capitol.

The defendant also admitted at his plea colloquy that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and that he willfully and knowingly engaged in parading, demonstrating and picketing in the Capitol Building.

## II.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). This offense is a Class B Misdemeanor, and therefore the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. No rioter was a mere tourist that day. As clearly shown by Defendant's own words to the FBI, he saw tear gas being thrown into the crowd and watched a window being punched. The friend he was next to saw the same, but also heard a loud boom and saw the crowd fighting with law enforcement. And yet Defendant entered the Capitol building anyway even though he told a friend the door was propped open by someone in the crowd and not opened by police.

Additionally, while looking at the Defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant

traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Sanders was seen in surveillance video wearing a military-type vest and walking through the Capitol.  As an Air Force veteran, Sanders was well aware of the great jeopardy posed by the rioters' violent entry into the Capitol.  He told the FBI he heard chants of "Four more years" and "Stop the Steal" while tear gas was thrown into the crowd from inside the Capitol and he saw a person trying to punch in a window in the Capitol. He nonetheless chose to be part of that riotous crowd and enter the building anyway. His admissions during his plea hearing, and his own statements of events surrounding his entry, establish unequivocally he knew no one "let him in" to the Capitol building on January 6, 2021.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, defendant has no criminal history and is reported to be a decorated veteran. ECF 29 ¶¶ 28-29, 38, 46. Sanders reported to the PSR writer that he enlisted in the U.S. Air Force in 1981 and retired as a Master Sergeant November 30, 2001. ECF 29 ¶¶ 38, 40, 46. The Defendant advised the PSR writer that he was the Human Resources Manager for Lewis Bakeries, Inc. and retired after 20 years with that company in May 2021. Id. at ¶ 47. The Defendant has been compliant with his conditions of pre-trial release.

While Defendant's military service is commendable, it makes his conduct on January 6 more egregious. His voluntary decision to storm a guarded government building is indefensible, especially considering his former military service and training.  His repeated assertions that he had done nothing wrong is not credible – his background shows he knew better. In this case,

Defendant's former military service demonstrates his conduct on January 6 is more than shocking and requires specific deterrence in the form of home confinement and community service.

Most importantly, Sanders has yet to show any remorse for his crime. When interviewed by the FBI, for example, he persisted in his claim that he had done nothing wrong or illegal by entering the Capitol.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). At the same time, each case must be analyzed individually, and in this case home detention is warranted.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. Actions have consequences. Actions that affect our democracy have consequences that affect all citizens. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

Sanders' words during his interview clearly demonstrate the need for specific deterrence. He stoutly adheres to his belief that his entering a restricted, cordoned off Capitol building in the midst of tear gas, a chanting and assaultive mob, and shattered windows was lawful. When he

15

entered the Capitol unlawfully with a large group of rioters, he knew the police had deployed tear gas in an effort to deter the illegal activity. That Sanders was untruthful in his interview with the FBI and has consistently shown no remorse for his criminal conduct on January 6 heightens the risk that he may engage in such behavior in the future

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfering with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence alone should not necessarily be the default.[2] As Judge Lamberth observed: "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not

---

[2] Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls into the latter category.

IV.   **Conclusion**

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jonathan Sanders, Sr. to two months of home confinement, two years of probation, and $500 in restitution. Such a sentence protects the community, promotes respect for

the law and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:    *Mona Lee M. Furst*
       MONA LEE M. FURST
       Assistant United States Attorney
       Kansas Bar No. 13162
       Detailee
       United States Attorney's Office
       District of Columbia
       Mona.Furst@usdoj.gov
       (316) 269-6537